Filed 1/9/26  In re D.L. CA2/1

Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re D.L., a Person Coming Under the Juvenile Court Law. | B321015 (Los Angeles County Super. Ct. No. MJ24058) |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> D.L., a Minor, <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Brian C. Yep, Judge.  Reversed.

Lynette Gladd Moore; Laini Millar Melnick, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Noah P. Hill and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Appellant D.L., who was born in 2001, appeals from orders sustaining a juvenile wardship petition and the juvenile court's disposition order.

On appeal, appellant does not challenge that he was a major participant in an attempted robbery. He does challenge the sufficiency of the evidence to support he participated in the attempted robbery with reckless indifference to human life. We previously concluded there was substantial evidence showing appellant acted with reckless indifference to human life and affirmed the order sustaining the Welfare and Institutions Code section 602 petition (section 602 petition) and the dispositional order.

The Supreme Court transferred the case to us to reconsider it in light of *People v. Emanuel* (2025) 17 Cal.5th 867 (*Emanuel).* Based on our high court's guidance in *Emanuel*, we conclude substantial evidence does not support that appellant acted with reckless indifference to human life. We also conclude no substantial evidence shows he harbored intent to kill. We thus reverse the juvenile court's order sustaining the section 602 petition and the juvenile court's disposition order.

## BACKGROUND

The juvenile court sustained count one of the second amended petition, which alleged that in February 2018, when appellant was 16 years old, appellant murdered John Ruh. The murder occurred while appellant and Deonta Johnson were

2

attempting to rob the store in which Ruh worked. The court found true that a principal was armed with a firearm.

In count two, the People alleged, and the court sustained, one count of attempted second degree robbery and found true that a principal was armed with a firearm.[1]

## 1.      *Evidence at trial*

In the 2022 trial, the parties stipulated Ruh died of multiple gunshot wounds. Appellant did not call any witnesses.

### a.      **M.H.'s testimony**

M.H. dated appellant and M.H.'s daughter referred to appellant as dad. Appellant told M.H. that Fatboy (Johnson) had proposed robbing the Dairy, a neighborhood convenience store. According to M.H., Fatboy was a member of the 30 Crip Harlem gang. M.H. testified appellant belonged to a different gang.

Appellant told M.H. he and Fatboy planned a robbery. They knew that Ruh worked alone. Appellant said he gave the gun to Fatboy "right before" entering the Dairy. Appellant told M.H. Fatboy was supposed to use the gun to scare Ruh.

Appellant also told M.H. the robbery did not "go as planned" because Fatboy shot the cashier, and that "was not supposed to happen." Appellant said, "Fatboy had shot him [Ruh] just for no reason." Appellant reiterated to M.H.: "They was just supposed to rob him and that was it." Appellant told M.H., "Fatboy had told the man to put his hands up" and appellant was near the door "telling him [Fatboy] to come on, and that's when Fatboy had shot the man."

---

[1] Additional allegations, including three counts of dissuading a witness, M.H., by force or threat, were dismissed.

After the shooting, appellant and Fatboy went to appellant's house where Fatboy had been staying. Appellant told M.H. the gun was "dirty" because Fatboy shot the cashier. Neither appellant nor Fatboy obtained any money from the attempted robbery.

Appellant told M.H. not to tell anyone about the attempted robbery and shooting, and told M.H., " 'I got to get out of here.' " After the shooting, M.H. saw appellant carry the gun to the "places we go" such as clubs. Appellant described the gun as " 'dirty' " and said, " '[I]t's got a body on it.' "

### b. Security footage

Detective Steven Blagg described the video footage of the attempted robbery.[2] "Mr. Ruh just accepted something from somebody [appellant] on the other side of the counter. When he opened the register another figure appeared [Johnson] . . . causing Mr. Ruh to slam the door shut of the cash register. What appears to be gunshots go off. And the person who was on the customer side of the counter [appellant], . . . then starts to walk towards the door while smiling."

Bragg testified about another video showing appellant asking Ruh, " 'Can I get a Newport [cigarette]?' " Appellant hands something to Ruh causing Ruh to open the cash register. After Ruh opens the cash register, Johnson says, " 'Empty the register.' " Ruh slammed the cash register shut. Ruh said, " 'What are you gonna rob me with a pellet gun?' " Ruh opened

---

[2] We augmented the record to include the video footage and allowed the parties to file supplemental briefs addressing the video footage.

4

the cash register because appellant paid for the Newport cigarette.

Detective Blagg further testified videos of the incident showed Johnson firing the gun. He said three shots could be heard on the video. According to Blagg, "[T]here was a lull between the first and second gunshot." Blagg testified each time Johnson fired, appellant's body twitched; Detective Blagg explained twitching is a typical response to a gunshot in close proximity. Blagg further stated that as the shots were being fired, appellant was "[v]ery slowly moving" towards the door. Appellant "continued to observe what was going on behind the counter." After the shooting, Johnson continued to try to break open the cash register and appellant left the Dairy. From the video, it appeared to Blagg appellant was about 15 yards ahead of Johnson as both traveled in the same direction away from the Dairy.

In addition to Detective Blagg's testimony, the surveillance videos show that the Dairy was a small store. A constant stream of customers entered and exited, but no customers appeared to be in the Dairy at the time appellant and Johnson attempted to rob Ruh. The small, enclosed space trapped Ruh behind a counter when Johnson shot him three times. Johnson stood between Ruh and the exit. Appellant was present for all three shots. The three shots were fired in rapid succession, and in total, the three shots occurred over less than one minute. Appellant did not appear to say anything during the shooting and did not intervene. When appellant left the Dairy, he was smiling.

### c.    Other evidence

Detective Scott Lawler testified about his interview of appellant. During that interview, appellant said he lived with

5

Fatboy, but when Fatboy stole from appellant's sister, appellant's mother told Fatboy to leave. Appellant also told Lawler that he went alone to the Dairy to get a cigarette and he "frequently" went to the Dairy.

Appellant further recounted, "While inside getting the cigarette somebody came in with a gun. He [appellant] ran, or attempted to run out but that individual was blocking the door. He finally made it outside and heard . . . two to three gunshots as he was running away."

After Detective Lawler informed appellant video surveillance depicted appellant and Johson approaching the Dairy, appellant then changed his story as follows: "[O]n the morning of the incident Deonta [Johnson] approached him . . . . [Johnson] stated 'Let's go get a cigarette.' That's when both of them left [appellant's] house to go get a cigarette. Appellant said that Johnson robbed the store. Appellant said that Johnson shot Ruh. Appellant "saw" Johnson shoot Ruh with a black and chrome semi-automatic firearm. Appellant said he did not call the police. Appellant told Lawler he knew Ruh.

## 2. *Court findings and sentence*

The juvenile court found the following facts: Deonta Johnson and appellant arrived at the Dairy around the same time. Appellant entered the Dairy and asked Ruh to buy a cigarette. "[T]his is part of a plan. . . . so that the victim will open the cash drawer. And as soon as the victim opened the cash drawer Deonta Johnson rushed in from the side, gun drawn, and asked the victim for money. The victim shuts the cash drawer and refuses to give the money to Deonta Johnson. There's a brief verbal exchange. And then Deonta Johnson shoots the victim three times."

6

The court continued: Appellant does not call "emergency medical services, does not try to assist the victim, he does not call 911 for the sheriff's [*sic*] to come." Johnson unsuccessfully tries to open the cash drawer and then Johnson and appellant run "across the same open field, in the direction of the minor's house."

The court found, "[T]here was clearly a plan . . . [a]nd the gun had to be part of the plan, otherwise the robbery would not be successful." As soon as Ruh opened the cash drawer, "Johnson rushed in from the side of the victim with the gun drawn. So clearly, the gun was part of the plan that was hatched to rob the Dairy."

Regarding reckless indifference, the court added, "The undisputed evidence is that the minor chose the Dairy for the robbery. The minor had been there many times before and he knew the victim. Clearly, the victim must also have known or known of the minor. With this in mind, how could the robbery have been successful unless the victim was shot and killed? In other words, how could Deonta Johnson and the minor have gotten away with the robbery if, in fact, the victim knew who they were or at least knew who the minor was."

The court found appellant was a major participant in the robbery who acted with reckless indifference to human life. The court then sustained the petition. The court sentenced defendant to a secure youth treatment facility for a period of 25 years to life.

## DISCUSSION

### A.    Standard of Review

Appellant's sole challenge is to the sufficiency of evidence that he acted with reckless indifference to human life and that he had intent to kill. To evaluate a substantial evidence challenge

" 'we review the record " ' "in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact" ' " ' could find beyond a reasonable doubt that [appellant] acted with reckless indifference." (*Emanuel*, *supra*, 17 Cal.5th at p. 885.)

## B.      Standard for Reckless Indifference to Human Life

### 1.      Legislation and our high court's pre-*Emanuel* precedent

Senate Bill No. 1437 amended Penal Code[3] section 189 to provide that a defendant who was not the actual killer or did not have an intent to kill is not liable for felony murder unless he "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(3); Stats. 2018, ch. 1015, § 3; *People v. Strong* (2022) 13 Cal.5th 698, 703 (*Strong*).) Section 190.2, subdivision (d) provides: "[E]very person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony [including robbery] . . . which results in the death of some person or persons, and who is found guilty of murder in the first degree . . . shall be punished by death or imprisonment in the state prison for life without the possibility of parole . . . ." (§ 190.2, subd. (d).) Our high court has observed that this definition of felony murder is based on "preexisting law governing felony-murder special-circumstance findings . . . to determine

---

[3] Undesignated statutory citations are to the Penal Code.

whether the defendant may be sentenced to death or life without possibility of parole."  (*Strong*, at p. 703.)

Section 190.2 codifies the rule announced in *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*).  (*People v. Clark* (2016) 63 Cal.4th 522, 616 (*Clark*).)  *Tison* and a prior United States Supreme Court case, *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*), permit imposition of the death penalty for felony murder when a defendant's involvement is substantial and demonstrates a reckless indifference to the risk of death.  The two cases "help define the constitutional limits for punishing accomplices to felony murder."  (*In re Loza* (2017) 10 Cal.App.5th 38, 46.)  "At one end of this *Enmund-Tison* continuum is ' "the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state." [Citation.]' [Citation.]  At the other end are the 'actual killers and those who attempted or intended to kill.  [Citation.]' [Citation.]  'Somewhere between them . . . lies the constitutional minimum' showing required for the imposition of death or life without the possibility of parole."  (*Ibid*.)  That constitutional minimum is the standard now incorporated into the definition of felony murder.  (§ 189.)

*Enmund*, *supra*, 458 U.S. 782 involved a robbery and murder of an elderly couple.  (*Id*. at p. 784.)  Enmund drove two confederates to the scene and waited to help them escape.  (*Id*. at pp. 786, 788.)  He was not present for the murder or robbery.  (*Id*. at p. 788.)  The Supreme Court held that imposition of the death penalty was inconsistent with the Eighth and Fourteenth Amendments when *Enmund* did not kill the victims, was not present when they were killed, and did not intend they be killed or anticipate that lethal force would or might be used.  (*Ibid*.)

9

The facts of *Tison* demonstrated a more culpable mental state than that harbored by the defendant in *Enmund*. In *Tison*, in an effort to help Gary Tison escape prison, the Tison family, including sons Raymond and Ricky, "assembled a large arsenal of weapons." (*Tison*, *supra*, 481 U.S. at p. 139.) Family members entered the prison carrying an ice chest filled with guns. (*Ibid*.) They armed Gary Tison and his cellmate and left the prison. (*Ibid*.) Gary Tison and his cellmate "brutally murder[ed]" four "captives" who had stopped to aid the Tison family fix a flat tire. (*Id*. at p. 141.) "Neither [Raymond nor Ricky] made an effort to help the victims, though both later stated they were surprised by the shooting." (*Ibid*.) Raymond and Ricky were convicted of felony murder for all four murders. (*Ibid*.)

The United States Supreme Court upheld the death sentence and concluded Raymond and Ricky showed reckless indifference to human life. (*Tison*, *supra*, 481 U.S. at p. 152.) The high court reasoned Raymond Tison was prepared to kill in furtherance of the prison break, flagged down the victims to assist with the flat tire, robbed the victims, and guarded them at gunpoint while the group considered their fate. Raymond "stood by and watched the killing, making no effort to assist the victims before, during, or after the shooting. (*Id*. at p. 151.) "Instead, he chose to assist the killers in their continuing criminal endeavors . . . ." (*Ibid*.) Similarly, Ricky Tison brought guns into the prison to arm the prisoners, participated in the kidnapping and robbery, and watched the killing without aiding the victims. (*Id*. at p. 152.)

Our high court applied *Enmund* and *Tison* in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*). In *Banks*, defendant Matthews "acted as the getaway driver for an armed robbery in

10

which Leon Banks and others participated." (*Id*. at p. 794.) "In the course of escaping, Banks shot one of the robbery victims." (*Ibid*.) Matthews and two of his confederates were gang members, but Banks was not a gang member. (*Id*. at pp. 795–796, 810.) Although the gang's primary activities included shootings, attempted murders, and murders, "[n]o evidence was presented that Matthews" or his fellow gang members "had killed before, or that Matthews knew any of the three had killed before." (*Id*. at p. 796.)

Our Supreme Court reversed the felony murder special circumstance based on its conclusion that Matthews was no more culpable than the getaway driver in *Enmund*. (*Banks*, *supra*, 61 Cal.4th at p. 794.) Our Supreme Court emphasized, "a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder such as Earl Enmund." (*Id*. at p. 802.) "Matthews, like Enmund and unlike the Tisons, did not see the shooting happen, did not have reason to know it was going to happen, and could not do anything to stop the shooting or render assistance." (*Id*. at p. 807.) Although Matthews knew he was participating in an armed robbery, "nothing at trial supported the conclusion beyond a reasonable doubt that Matthews knew his own actions would involve a grave risk of death. There was no evidence Matthews intended to kill or, unlike the Tisons, knowingly conspired with accomplices known to have killed before. Instead, as in *Enmund*, Banks's killing of [the victim] was apparently a spontaneous response to armed resistance from the victim." (*Ibid*.)

Subsequent to *Enmund* and *Tison*, courts have refined the meaning of reckless indifference to human life. " '[T]he culpable

11

mental state of "reckless indifference to life" is one in which the defendant "knowingly engag[es] in criminal activities known to carry a grave risk of death" [citation] . . . .' [Citation.]" (*In re Bennett* (2018) 26 Cal.App. 5th 1002, 1021.)

The following nonexclusive factors are relevant to whether defendant acted with reckless indifference to human life: (1) the defendant's knowledge of weapons and use of a weapon even if the defendant did not kill the victim; (2) the defendant's presence at the scene of the crime and failure to aid the victim; (3) the duration of the felony; (4) the defendant's knowledge of a cohort's likelihood of killing; and (5) the defendant's efforts to minimize risk of violence during the felony. (*Clark*, *supra*, 63 Cal.4th at pp. 618–623.) No single factor is " 'necessary' " or " 'necessarily sufficient.' " (*In re Bennett*, *supra*, 26 Cal.App.5th at p. 1019.)

Our high court explained in *Clark* that the mental state comprising reckless indifference "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his [or her] actions." (*Clark*, *supra*, 63 Cal.4th at pp. 616–617.) The required intent has "both subjective and objective elements. The subjective element is the defendant's conscious disregard of risks known to him or her. But recklessness is not determined merely by reference to a defendant's subjective feeling that he or she is engaging in risky activities. Rather, recklessness is also determined by . . . what 'a law-abiding person would observe in the actor's situation.' [Citation.]" (*Id*. at p. 617.)

In *In re Scoggins* (2020) 9 Cal.5th 667 (*Scoggins*), our high court held a petitioner, who planned an unarmed assault and was not present when a confederate shot the victim, did not act

12

with reckless indifference to human life. (*Id*. at pp. 671, 672, 678–679.) *Scoggins* further held, " '[a]wareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' " to establish reckless indifference to human life; " 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement. [Citation.] Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life." (*Id*. at p. 677.)

### 2. *Emanuel*

After we issued our initial opinion, our high court decided *Emanuel*, which provides additional guidance regarding the *Clark* factors discussed in the preceding subsection. In applying the substantial evidence standard of review, the high court concluded there was insubstantial evidence to support that the defendant in that case participated in the murder with reckless indifference to human life. (*Emanuel*, *supra*, 17 Cal.5th at p. 875.)

*Emanuel* first recounted our high court's prior cases, including *Banks*, *Clark*, *and Scoggins*, in observing, " 'The degree of risk to human life is crucial to the analysis[ ]' " of reckless indifference to human life. (*Emanuel*, *supra*, 17 Cal.5th at p. 884.) It further observed, the *Clark* factors "aid in distinguishing those who knowingly engage in criminal activities known to carry a grave risk of death from other felony perpetrators. (*Ibid*.) Noting that the *Clark* factors are " 'nonexhaustive' " (*Emanuel*, at pp. 884–885, quoting *Strong*, *supra*, 13 Cal.5th at p. 706)), *Emanuel* also repeated *Clark*'s observation that no one of the *Clark* factors is necessary or necessarily sufficient. (*Emanuel*, at p. 885.) Finally, our high

13

court echoed *Scoggins* in cautioning courts to consider the totality of circumstances to determine whether a defendant acted with reckless indifference to human life. (*Emanuel*, at p. 885.) The court, however, cautioned lower courts "to consider the presence or absence of evidence relating to each relevant factor on its own merits before considering the evidence in its totality." (*Id.* at p. 888.)

*Emanuel* applied this jurisprudence to a defendant, Louis Sanchez Emanuel, whose confederate, Jacob Whitley, shot and killed a drug dealer in the commission of a robbery perpetrated by defendant and Whitley. (*Emanuel, supra*, 17 Cal.5th at p. 874.) Whitley and Emanuel agreed to meet John Sonenberg and Mansour Amini in a park in order to purchase marijuana. (*Id.* at p. 876.) At 3:06 p.m. Sonenberg texted Emanuel that he would be at the park "right now" and the shooting occurred at approximately 3:15 p.m. (*Id.* at pp. 876–877.) Sonenberg died at the scene of a close-range gunshot wound to his neck. (*Id.* at p. 877.)

Emanuel's ex-girlfriend told a police sergeant that Whitley "told her he had 'shot a white boy' . . . three times" and Emanuel "confirmed" Whitley's statement. (*Emanuel, supra*, 17 Cal.5th at p. 878.) Emanuel's ex-girlfriend also told police that when she saw Emanuel on the day of the shooting, he had removed "the dreads he wore earlier in the day." (*Ibid.*) Emanuel told his ex-girlfriend, " ' "I didn't do nothing though. I didn't do nothing. And [Whitley] was the one who shot him." ' " (*Ibid.*) Emanuel's ex-girlfriend told the police Sonenberg would not give the marijuana to Emanuel and Whitley, and Emanuel then said, " '[Whitley,] let's go,' " but Whitley would not leave. (*Id.* at p. 879.) Emanuel's ex-girlfriend reported Emanuel told her that

14

"after the shooting, he asked Whitley, ' "What the fuck you doing?" ' " (*Id*. at p. 879.)

The high court first considered the "[u]se of or awareness of the presence of weapons and knowledge of cohort's likelihood of killing." (*Emanuel*, *supra*, 17 Cal.5th at p. 885, capitalization & italics omitted.) The court noted the defendant did not use a gun and did not know his confederate was armed. It also noted the trial court's finding there was no evidence demonstrating the defendant knew Whitley was likely to use lethal force. (*Ibid*.)

The high court next considered the "[d]uration of the crime" (capitalization & italics omitted) and commented neither the trial nor appellate court addressed the duration of the felony. The Attorney General, however, conceded the duration of the interaction of Emanuel, Whitley, and the victim in total was not likely more than 12 minutes, and the duration of the violent contact between Whitley and the victim " 'presumably' " even less than that. (*Emanuel*, *supra*, 17 Cal.5th at p. 886.) The court then cited evidence Whitley shot the victim during a brief struggle and there was no prolonged period of restraint when, during the violence that ensued, the victim refused to relinquish the marijuana. (*Ibid*.) Our high court concluded, "The *Clark* factor concerning duration of the crime therefore is neutral in this case; it did nothing to heighten the risk of violence beyond that inherent in the robbery itself." (*Ibid*.)

The next *Clark* factor *Emanuel* considered was "efforts taken to minimize violence." (*Emanuel*, *supra*, 17 Cal.5th at p. 887, capitalization & italics omitted.) The high court recognized, "We have never required direct evidence that a felony was planned a certain way for the express purpose of minimizing the risk of violence; circumstantial evidence regarding the plan

itself may suffice." (*Ibid*.) The court credited Emanuel's planning "to participate in a robbery in a public location during daylight hours. The crime occurred in the open where witnesses might be present to observe from the park, passing vehicles, or nearby residences." (*Ibid*.) The court added there was no evidence Emanuel knew Whitley had a propensity for violence and concluded, "This factor therefore does not support a finding of reckless indifference." (*Ibid*.)

The high court then addressed the defendant's "[p]hysical presence at the scene and opportunity to restrain confederates or aid victims." (*Emanuel*, *supra*, 17 Cal.5th at p. 888, capitalization & italics omitted.) It concluded defendant "attempted to act as a restraining influence" by advocating that he and his confederate "leave." (*Id.* at p. 891.) Specifically, defendant said, " '[L]et's go,' " and "began walking away from the robbery." (*Ibid*.) The high court interpreted this evidence as providing "crucial insight into Emanuel's state of mind. When met with resistance, Emanuel abandoned the plan rather than resort to greater violence." (*Ibid*.) In disagreeing with the Attorney General's argument the defendant could have done more, our high court emphasized, "The focus should not be on the ultimate *efficacy* of his actions, but on what his actions reveal about his mental state. The courts below did not carefully consider evidence bearing on Emanuel's state of mind but rather simply judged that he had not employed an adequate measure of restraint." (*Ibid*.) The court further cautioned faulting a defendant for not intervening when a crime unfolds quickly: "[T]he failure to restrain a cohort — cannot be said to weigh in favor of a finding of reckless indifference without some evidence

16

in the record indicating that the defendant had a meaningful opportunity to do so.  (*Id*. at p. 892.)

In addressing the defendant's failure to aid the victim and running away from the scene, *Emanuel* noted the difficulty in drawing inferences about a defendant's state of mind from defendant's flight from the scene.  Flight could support the inference the defendant merely wanted to avoid arrest or instead, that defendant had "reject[ed] . . . the shooter's actions." (*Emanuel*, *supra*, 17 Cal.5th at pp. 893–894.)  The court advised caution in inferring a defendant's state of mind merely from postflight conduct and held postflight conduct alone is "insufficient" to support murder liability:  "However contemptable we may find a defendant's conduct following a killing, the governing standard is not satisfied by evidence that the defendant was generally indifferent to the fact that someone *has been* killed; it requires evidence that, at the time of the shooting, the defendant acted with indifference toward the grave risk that someone *could be* killed.  Though the former may be evidence of the latter, it is insufficient, standing alone, to support murder liability."  (*Id*. at p. 895.)

Based on the totality of the circumstances, the high court concluded there was insufficient evidence that the defendant had acted with reckless indifference to human life.  (*Emanuel*, *supra*, 17 Cal.5th at pp. 895–896.)  It reasoned (1) the crime occurred in daylight in a public place; (2) the defendant was not armed and did not know his confederate was armed or likely to use lethal force; (3) the crime occurred "without a prolonged period of restraint"; (4) the defendant suggested aborting the robbery when the victim resisted; and (5) the defendant's postshooting flight without rendering aid was "ambiguous."  In sum, "nothing in the

plan . . . 'elevated the risk to human life beyond those risks inherent in any armed robbery,' much less a planned unarmed robbery." (*Emanuel*, at p. 895, quoting *Clark*, *supra*, 63 Cal.4th at p. 623.)

Finally, the high court declined to consider the significance, if any, of the defendant's age (21 years) because that issue had not been raised in the lower courts. (*Emanuel*, *supra*, 17 Cal.5th at p. 885, fn. 6.)

## C. Under *Emanuel*, No Substantial Evidence Supports the Juvenile 's Court's Finding That Appellant Acted with Reckless Indifference to Human Life

*Emanuel* makes certain principles clear in applying the *Clark* factors. First, we must consider each factor separately before reviewing the totality of the circumstances. Second, the duration of the crime may be relevant to more than one factor. Third, a defendant's flight from the scene is not sufficient, by itself, to support murder liability. Finally, the evidence must support a greater risk of death than that inherent in an armed robbery.

### 1. Appellant's use of, or awareness of, the presence of weapons and knowledge of cohort's likelihood of killing

Appellant's providing the weapon to his companion, contrasts with *Emanuel*, where the defendant did not know his confederate was armed. Here, though, there was no evidence of Fatboy's propensity for violence or that Fatboy was otherwise likely to use the gun to shoot Ruh.

Appellant did not personally use the gun. M.H. testified appellant told her he did know Fatboy would use the gun to shoot

18

Ruh. Instead, appellant told her the robbery did not "go as planned" because Fatboy shot the cashier, and that "was not supposed to happen."

## 2. Duration of the crime

The videos demonstrate the robbery and murder lasted less than one minute. This is far less than the 9 to 14 minute time frame in *Emanuel*. (*Emanuel, supra*, 17 Cal.5th at p. 886.) As in *Emanuel,* there was "no prolonged period of restraint . . . ." (*Ibid*.) Also as in *Emanuel,* the short duration suggests that there was "nothing to heighten the risk of violence beyond that inherent in the robbery itself." (*Ibid*.)

## 3. Efforts taken to minimize the risk of violence

In *Emanuel*, the court emphasized that this factor concerns "[e]fforts at the planning stage to minimize the potential for violence." (*Emanuel, supra*, 17 Cal.5th at pp. 887–888.) "Emanuel planned to participate in a robbery in a public location during daylight hours. The crime occurred in the open where witnesses might be present to observe from the park, passing vehicles, or nearby residence." (*Id*. at p. 887.) Based on those facts, the high court concluded this factor did not support a finding of reckless indifference.

Here, like in *Emanuel*, Johnson and appellant planned the robbery during daylight hours. In contrast to *Emanuel*, the location was not in the open, but inside a small store, where Johnson trapped Ruh behind a counter.

### 4. Physical presence at the scene and opportunity to restrain confederates or aid victims

In *Emanuel*, the high court found Emanuel "attempted to act as a restraining influence." (*Emanuel*, *supra*, 17 Cal.5th at p. 891.) As set forth above, he "advocated that he and Whitley leave." (*Ibid*.) Emanuel said, " '[L]et's go" and "began walking away from the robbery." (*Id*. at p. 891.) "Emanuel abandoned the plan rather than resort to greater violence." (*Ibid*.)

The high court explained although we must consider whether a defendant acts as a restraining influence on his cohorts, it is not incumbent on a defendant to actually prevent the violence or attempt to do so by any means necessary. (*Emanuel*, *supra*, 17 Cal.5th at p. 891.) The high court cautioned that the "focus should not be on the ultimate *efficacy* of [Emanuel's] actions, but on what his actions reveal about his mental state." (*Ibid*.) The high court emphasized, "where violence unfolds 'quickly,' a defendant may 'lack[ ] control' over the actions of his confederates." (*Id*. at p. 892.)

We acknowledge that in contrast to *Emanuel*, there was no evidence here appellant attempted to act as a restraining influence. He did not say, "[L]et's go," but watched as Johnson shot Ruh multiple times. Yet, there also was no showing appellant had control over Johnson's conduct and the videos clearly show the shooting occurred very quickly. Respondent's contention that "appellant could have minimized the risk to life or acted as a restraining influence" is thus not supported by the record. The violence unfolded in less than a minute, which did not afford appellant the opportunity to stop Johnson or act as a restraining influence.

20

## 5. Totality of the circumstances

Considering the totality of the circumstances, and measured against *Emanuel*'s guidance, the evidence does not support the juvenile court's finding that appellant acted with reckless indifference to human life. Appellant told his ex-girlfriend the plan was only to scare Ruh with the gun, not to kill him. The *Emanuel* court credited a similar arguably self-serving statement in relying on the defendant's statement to his ex-girlfriend that he had told his confederate, "[L]et's go." (*Emanuel*, *supra*, 17 Cal.5th at p. 879.) The short duration of the crime provided appellant no meaningful opportunity to restrain Johnson or to aid Ruh. Although appellant supplied the gun to Johnson and knew Johnson was a gang member, there was no evidence appellant knew Johnson would shoot and kill Ruh or knew more generally that Johnson had a propensity to use a firearm.

As also set forth earlier in our Discussion, *Emanuel* took a chary view of concluding reckless indifference from a defendant's postshooting conduct: " '[W]hen different inferences may be drawn from the circumstances, the defendant's actions after the shooting may not be very probative of his mental state.' [Citation.]" (*Emanuel*, *supra*, 17 Cal.5th at p. 893.) As one example, *Emanuel*, noted postshooting flight may be indicative merely of not wanting to be arrested, and not the defendant's state of mind at the time of the killing. Similarly, here, one could infer a desire to prevent arrest rather than reckless indifference from appellant's false and different renditions to Lawler about the robbery. Given *Emanuel*, appellant's possession of the gun and statement after the shooting that the gun had "a body on it"

21

do not inform us about his mental state at the time of the shooting.  (See *Emanuel*, at p. 894.)

Appellant's smile after the shooting is also subject to multiple inferences.  It may support an inference appellant was pleased with what occurred at the Dairy.  On the other hand, his smile may be reflective of his immaturity and wanting to be accepted by Johnson, or it may have been the product of shock that the robbery resulted in Ruh's death.[4]  (See *J.D.B. v. North Carolina* (2011) 564 U.S. 261, 273 ["children characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them"]; see also *People v. Hardin* (2024) 15 Cal.5th 834, 844 [children are more vulnerable than adults to negative influences and outside pressures including from their peers]; *In re Moore* (2021) 68 Cal.App.5th 434, 454 ["defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life"].)

## D.    No Substantial Evidence Supports the Juvenile Court's Finding That Appellant Harbored Intent To Kill Ruh

Finally, the juvenile court's finding that Ruh "must have known" appellant and therefore appellant must have intended to shoot Ruh in order for the robbery to be successful is not supported by substantial evidence.  No witness testified Ruh actually knew appellant, or more generally, knew the Dairy's customers.  The court's conclusion that appellant "must have" intended to kill Ruh is also not supported by the evidence and not

---

[4] The video footage does not clearly show when appellant started smiling.

in keeping with *Emanuel*'s guidance.  Appellant told M.H. the plan was to scare Ruh and the events did not unfold as planned. The record contains no evidence supporting the court's inference appellant intended to kill Ruh to prevent Ruh from later identifying him.

## DISPOSITION

The court's order sustaining the petition and the court's disposition order are reversed.

NOT TO BE PUBLISHED.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

WEINGART, J.